## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DEVISION

| | | |
|---|---|---|
| | § | |
| TRUE CAPITAL PARTNERS, LLC. | § | CIVIL ACTION |
| | § | |
| Plaintiff, | § | Case No. |
| | § | |
| v. | § | |
| | § | |
| JACK COKER, WRENDEN HUNT, LUKE | § | |
| REILLY, and HTX-LDN, LLC d/b/a H&C | § | |
| SEARCH, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | : | |

## VERIFIED COMPLAINT AND APPLICATION FOR TRO, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

Plaintiff True Capital Partners, LLC ("True") by and through its undersigned counsel, hereby sues Defendants, Jack Coker, Wrenden Hunt, Luke Reilly, (collectively referred to as "Individual Defendants"), and HTX-LDN, LLC d/b/a H&C Search ("HTX") (Individual Defendants and HTX are collectively referred to as "Defendants") for their deliberate, brazen, and blatantly unlawful breach of their contracts and duty of loyalty owed to True. Specifically, the Individual Defendants, led by Coker and *while still employed by True*, misrepresented their allegiances to True to earn True's trust and manipulate True into believe they had True's best interests at heart. To that end, the Individual Defendants represented to True that they were committed employees, dedicated to True's success, all while secretly forming a new competing company, HTX, diverting True funds into HTX, and otherwise engaging in other unlawful activities to their benefit and True's detriment without any hint of remorse. Defendants then used

1

this information to unlawfully interfere with True's business relations and unlawfully compete with True.  In support of its claims, True states the following:

## NATURE OF THE CASE

1.      This action arises out of the Individual Defendants' breach of contract and duties of loyalties owed to True, as well as their tortious interference with True's contractual and business relations, including Defendants' misappropriation of True's trade secrets in violation of federal law.  Defendants' misconduct was calculated to, and did, damage True's competitive position in the marketplace and unfairly strengthen HTX's respective position in the same market.

2.      As a result of Defendants' improper and unlawful conduct, True has been harmed and seeks redress from the Court in the form of a temporary restraining order and/or preliminary injunction; permanent injunction; monetary damages, including compensatory, punitive, and exemplary damages, and injunctive relief.

## PARTIES

3.      Plaintiff, True Capital Partners, LLC, is a New Jersey Limited Liability Company with a present principal place of business in Philadelphia, Pennsylvania.  True is a global leader in in identifying and placing Board Members, C-suite executives, Vice Presidents, Directors, and other strategic talent at various companies.

4.      Jack Coker is an individual who is a resident and citizen of the State of Texas.  Coker is a former True employee who now is a Managing Member of HTX, a direct competitor of True.

5.      Wrendon Hunt is an individual who is a resident and citizen of the State of Texas.  Hunt is a former True employee who now is a Managing Member of HTX, a direct competitor of True.

6.      Luke Reilly is an individual who is a resident and citizen of the Commonwealth of Pennsylvania.  Reilly is a former True employee who conspired with Coker and Hunt to breach his contract and duty of loyalty with True and is currently an HTX employee, a direct competitor of True.

7.      HTX is a Texas limited liability company formed on August 8, 2023 with a principal place of business located at 26334 Cottage Springs Court, Katy, Texas, 77494.  HTX is a direct competitor of True and provides identical services as True, operates in the same industry and geographical area as True.  HTX was founded by Coker and Hunt as Managing Members, with Hunt serving as HTX's Registered Agent.

## JURISDICTION AND VENUE

8.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

9.      This Court has personal jurisdiction over Coker and Hunt because they are citizens of the State of Texas.  Further, HTX is a limited liability company in which its citizen ship is determined by the citizenship of its members, Coker and Hunt, who are citizens of the State of Texas.  Therefore, HTX is a citizen of the State of Texas.

10.      Venue is appropriate in the Southern District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district, as Coker, Hunt, and HTX reside in this District, substantially perform HTX's business operations in this District, and the harm to True and breach occurred, in part, and continues to occur, in this District.

## STATEMENT OF FACTS

A.      **Coker's Employment with True.**

11.     Prior to joining True, Coker previously worked for Hobbs & Towne, Inc. ("HTI"), a climate technology and sustainability executive search term that served mission-driven companies placing leaders at cutting-edge tech companies.

12.     In or around November 2021, True and HTI engaged in negotiations related to True's acquisition of HTI and subsequently formed a new Climate Tech practice at True (the "HTI Acquisition").

13.     As a part of the HTI Acquisition, True agreed to hire various HTI employees on the express condition that they enter into restrictive covenants with True to ensure that HTI employees would not subsequently resign from True and attempt to poach True's acquired clients and employees.

14.     On November 22, 2021, as part of the HTI Acquisition, True offered Coker a position at True as a Partner working remotely from the State of Texas.

15.     As a True Partner, Coker worked in True's Climate Tech practice group and was responsible for identifying and placing talent with True's clients that operate within the energy, built environment, climate, food/water/agriculture, industrials/manufacturing, intelligence, transportation/mobility, decarbonization, and fund management industries.

16.     In his role, Coker was a high-level employee entrusted with confidential information, and with authority to bind True into contracts and business relations with prospective True clients.

17.     As a condition of his employment following the HTI Acquisition, Coker executed an Employee Expectation Agreement ("Coker Agreement") dated November 24, 2021 which governed the terms and conditions of Coker's employment with True. *See* Coker November 24, 2021 Employee Expectation Agreement, attached hereto as **Exhibit A**.

18.     The Coker Agreement included various restrictive covenants and confidentiality provisions agreed to by Coker.  Relevant provisions of the Coker Agreement include the following:

1.     Jack Coker acknowledges that Jack Coker will, in the course of, or incident to, their employment by True, obtain from True and its affiliates various trade secrets and other confidential business information of True and its affiliates (all of which is referred to herein as "Confidential Information"). "Confidential Information" shall include all information that is not known by the industry at large and that concerns the business affairs of True or its affiliates, including: any trade secrets; client information, including client identity, client lists, contact persons, and client needs and preferences; operating procedures, including techniques and processes; business plans; and information concerning specialized business methods and techniques and financial information. Jack Coker further acknowledges that Jack Coker will, in the course of, or incident to, their employment by True develop personal and professional relationships with True's clients, business associates, and other employees. The relationships which Jack Coker has developed and will develop in connection with their employment with True are very valuable to True. Jack Coker acknowledges that, as between True and Jack Coker, all Confidential Information is and shall remain the exclusive property of True. Jack Coker agrees that they will hold all Confidential Information in the strictest confidence, and that they will not disclose, communicate, or divulge the same to, or use the same for the direct or indirect benefit of any person or entity other than True.

2.     Jack Coker agrees to return to True all documents (whether in hard-copy or electronic form), materials, computer software, supplies, calling or credit cards, keys, passes, and any other property or data, that is the property of True or was used in the course of Jack Coker's employment with True, including but not limited to all documents and materials containing Confidential Information. The return of such items shall be made at or before the time of termination, or if that is not possible, as soon thereafter as is possible.

3.     Except on behalf of True, Jack Coker will not, directly or indirectly, solicit or otherwise induce any employee of True to terminate or modify their employment with True or to join another business organization. The restrictions in this Paragraph 3 will expire twelve (12) months after the cessation of Jack Coker's employment.

4.     Except on behalf of True, Jack Coker will not, directly or indirectly, solicit or in any way contact any of True's clients in an attempt to obtain business of the same or similar type as performed by True, or being planned by True during Jack Coker's employment, or in any way interfere with True's business relationships with those clients. The restrictions in this Paragraph 4 also apply to prospective clients of True, if Jack Coker has communicated to such prospective client on behalf of True in the final ninety (90) days of Jack Coker's employment with True. The restrictions in this Paragraph 4 will expire twelve (12) months after the

cessation of Jack Coker's employment, and are limited to those clients with whom Jack Coker had contact during their final twelve months of employment.

5.      Any rights enjoyed by True under this Agreement, including the protection of Confidential Information, shall be enjoyed by its affiliates.

6.      Jack Coker expressly recognizes that any breach of this Agreement by Jack Coker will result in irreparable injury to True and agrees that True shall be entitled, if it so elects, to institute and prosecute proceedings in any court of competent jurisdiction, either in law or in equity, to obtain damages for any breach of this Agreement, to enforce the specific performance by Jack Coker of this Agreement, and/or to enjoin Jack Coker from activities in violation of this Agreement. Moreover, if any portion of this Agreement is held to be unenforceable because of the area covered, or its duration or scope, Jack Coker agrees that the court making such determination shall have the power to reduce or limit the area, duration, and/or scope, and the covenant shall be enforceable in its reduced form. The provisions of this Agreement are independent of and separable from one another, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.

*See* **Exh. A**.

19.     The Coker Agreement is governed by and construed in accordance with the laws of the State of New Jersey, notwithstanding any state's choice of law rules to the contrary. *Id.*

20.     Coker executed the Coker Agreement on December 9, 2021. *Id.*

21.     During Coker's employment at True, Coker was a highly compensated employee.

22.     In 2024, Coker's last full year of employment with True, Coker earned in excess of $1,000,000.00.

**B.      Hunt's Employment with True.**

23.     On December 16, 2022 True offered Hunt a position at True as a Partner in True's Climate Tech practice working remotely from the State of Texas. *See* Hunt December 16, 2022 Offer Letter, attached hereto as **Exhibit B** ("Hunt Offer Letter").

24.     Hunt's role was similar to Coker's role in True's Climate Tech practice group. To that end, Hunt was responsible for identifying and placing talent with True's clients that operate

within the energy, built environment, climate, food/water/agriculture, industrials/manufacturing,

intelligence, transportation/mobility, decarbonization, and fund management industries.

25.    The Hunt Offer Letter included a one-time sign-on bonus of $200,000 to be paid

on the second pay date after Hunt's start date ("Bonus").  *See* **Exh. B**.

26.    Hunt's Bonus was subject to a three year claw back, "vesting ratably monthly, from

the time the payment is processed."  *Id.*  If Hunt voluntarily terminated his employment before

completing the third year of employment following the payment date, Hunt agreed to refund True

the non-vested portion of the Bonus.  *Id.*

27.    As a part of the Hunt Offer Letter, Hunt acknowledged his responsibilities related

to True's confidential information and agreed as follows:

> 13.    Wrendon Hunt acknowledges that Wrendon Hunt will, in the course of, or incident to, their employment by True, obtain from True and its affiliates various confidential business information of True and its affiliates (all of which is referred to herein as "Confidential Information"). Confidential Information means competitively valuable information that is important to True, that Wrendon Hunt learns of through employment with True or has access to by virtue of employment with True, whether generated by True or its affiliates or by third parties, and includes all information that is not known by the industry at large and that concerns the business affairs of True or its affiliates, and includes any trade secrets. Wrendon Hunt agrees that any trade secrets or other valuable information or intellectual property developed by Wrendon Hunt, solely or in conjunction with others, while employed by True, shall be the sole and exclusive property of True. Wrendon Hunt agrees that they will hold all Confidential Information in confidence, and will not disclose, communicate, or divulge the same to, or use the same for the direct or indirect benefit of any person or entity other than True.

*Id.*

28.    Hunt executed the Hunt Offer Letter on February 16, 2023.  *Id.*

29.    During Hunt's employment at True, Hunt was a highly compensated employee.

30.    In 2024, Hunt's last full year of employment with True, Hunt earned in

excess of $900,000.00.

C.    __Reilly's Employment with True__.

31.    On November 22, 2021, also as a part of the HTI Acquisition, True offered Reilly a position at True as a Senior Associate working at True's Pennsylvania office within its Climate Tech practice ("Reilly Offer Letter").

32.    Reilly's role was similar to that of Coker's and Hunt's role in True's Climate Tech practice group.  To that end, Reilly was responsible for identifying and placing talent with True's client's that operate within the energy, built environment, climate, food/water/agriculture, industrials/manufacturing, intelligence, transportation/mobility, decarbonization, and fund management industries.

33.    As a condition of his employment following the HTI Acquisition, Reilly executed an Employee Expectation Agreement ("Reilly Agreement") dated November 24, 2021 which governed the terms and conditions of Coker's employment with True.  *See* Reilly November 24, 2021 Employee Expectation Agreement, attached hereto as **Exhibit C**.

34.    The Reilly Agreement included various restrictive covenants and confidentiality provisions agreed to by Reilly.  Relevant provisions of the Reilly Agreement include the following:

> 1.    Luke Reilly acknowledges that Luke Reilly will, in the course of, or incident to, their employment by True, obtain from True and its affiliates various trade secrets and other confidential business information of True and its affiliates (all of which is referred to herein as "Confidential Information").  "Confidential Information" shall include all information that is not known by the industry at large and that concerns the business affairs of True or its affiliates, including: any trade secrets; client information, including client identity, client lists, contact persons, and client needs and preferences; operating procedures, including techniques and processes; business plans; and information concerning specialized business methods and techniques and financial information. Luke Reilly further acknowledges that Luke Reilly will, in the course of, or incident to, their employment by True develop personal and professional relationships with True's

8

clients, business associates, and other employees. The relationships which Luke Reilly has developed and will develop in connection with their employment with True are very valuable to True. Luke Reilly acknowledges that, as between True and Luke Reilly, all Confidential Information is and shall remain the exclusive property of True. Luke Reilly agrees that they will hold all Confidential Information in the strictest confidence, and that they will not disclose, communicate, or divulge the same to, or use the same for the direct or indirect benefit of any person or entity other than True.

2.    Luke Reilly agrees to return to True all documents (whether in hard-copy or electronic form), materials, computer software, supplies, calling or credit cards, keys, passes, and any other property or data, that is the property of True or was used in the course of Luke Reilly's employment with True, including but not limited to all documents and materials containing Confidential Information. The return of such items shall be made at or before the time of termination, or if that is not possible, as soon thereafter as is possible.

3.    Except on behalf of True, Luke Reilly will not, directly or indirectly, solicit or otherwise induce any employee of True to terminate or modify their employment with True or to join another business organization. The restrictions in this Paragraph 3 will expire twelve (12) months after the cessation of Luke Reilly's employment.

4.    Except on behalf of True, Luke Reilly will not, directly or indirectly, solicit or in any way contact any of True's clients in an attempt to obtain business of the same or similar type as performed by True, or being planned by True during Luke Reilly's employment, or in any way interfere with True's business relationships with those clients. The restrictions in this Paragraph 4 also apply to prospective clients of True, if Luke Reilly has communicated to such prospective client on behalf of True in the final ninety (90) days of Luke Reilly's employment with True. The restrictions in this Paragraph 4 will expire twelve (12) months after the cessation of Luke Reilly's employment, and are limited to those clients with whom Luke Reilly had contact during their final twelve months of employment.

5.    Any rights enjoyed by True under this Agreement, including the protection of Confidential Information, shall be enjoyed by its affiliates.

6.    Luke Reilly expressly recognizes that any breach of this Agreement by Luke Reilly will result in irreparable injury to True and agrees that True shall be entitled, if it so elects, to institute and prosecute proceedings in any court of competent jurisdiction, either in law or in equity, to obtain damages for any breach of this Agreement, to enforce the specific performance by Luke Reilly of this Agreement, and/or to enjoin Luke Reilly from activities in violation of this Agreement. Moreover, if any portion of this Agreement is held to be unenforceable because of the area covered, or its duration or scope, Luke Reilly agrees that the court making such determination shall have the power to reduce or limit the area, duration, and/or scope, and the covenant shall be enforceable in its reduced form. The provisions of

this Agreement are independent of and separable from one another, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.

*See* **Exh. C**.

35.    During Reilly's employment at True, Reilly was a highly compensated employee.

36.    In 2024, Reilly's last full year of employment with True, Reilly earned in excess of $290,000.

**D.    Coker Formulates and Executes Secret Plan with Individual Defendants to Gain True's Trust.**

37.    In or around August 2023, the Individual Defendants formulated a secret plan, spearheaded by Coker and Hunt, to form a new entity, HTX, to directly compete with True.

38.    To that end, on August 8, 2023 Coker and Hunt formed and registered HTX as "HTX-LDN, LLC." *See* Certificate of Formation, attached hereto as **Exhibit D**.

39.    Both Coker and Hunt are listed as Managing Members of HTX.

40.    However, Coker's restrictive covenants, detailed *supra*, was an obstacle in allowing Defendants to achieve their objectives.

41.    To help further his nefarious goals, Coker formulated a plan to convince True to terminate his obligations under the Coker Agreement.

42.    Beginning shortly after he and Hunt formed HTX, Coker approached Brad Stadler and Joseph Riggione, True's Co-Chief Executive Officers, to initiate conversations to terminate his restrictive covenant obligations in the Coker Agreement.

43.    Coker commented to Stadler and Riggione that he did not feel that he received any "significant" economic benefit from the HTI Acquisition and did not think he should be bound by the restrictive covenants in the Coker Agreement.

44.    Coker also said that he was interested in assuming more responsibility within the Climate Tech practice and taking on a leadership role within the practice.

45.    Following their conversations with Coker, Stadler and Riggione began considering how they could increase Coker's profile, both internally within True and externally to True's clients.

46.    Based on Coker's representations that he wanted to play a more significant role in the Climate Tech practice, Stadler and Riggione decided to begin increasing his visibility so that he could become the future Climate Tech practice lead.

47.    Over the course of the next year and a half, True began presenting Coker to clients as the future Climate Tech practice lead.    Coker attended various networking events, was introduced to new True clients, and collaborated with others on True projects to help transition him towards the Climate Tech practice lead role and become the "face" of the practice.

48.    During this time, Coker obtained invaluable information regarding True's Confidential Information (as defined herein), including, but not limited to, True's: (1) business practices; (2) client information; (3) client identity; (4) client lists; (5) contact persons; (6) client needs and preferences; (7) operating procedures; (8) business plans; and (9) specialized business methods and techniques.

49.    As a part of his ruse, Coker also formed what other True employees believed to be meaningful and genuine relationships, both personally and professionally.    Many employees, who would come to rely on Coker for work opportunities, felt that they established a close and trusting relationship with Coker.

50.    Having earned Riggione's trust, in or around January 2024, Coker convinced Riggione to allow Coker to engage in high level consulting services with a True client, Prelude

Ventures LLC ("Prelude") to provide business services to Prelude for the benefit of True.  *See* Addendum to Coker Agreement, attached hereto as **Exhibit E** ("Coker Addendum").  The Coker Addendum was intended only to allow Coker to advise Prelude as to which executive search firms to use, whether True or another search firm.

51.    Notably, the Coker Addendum ***did not*** include permission for Coker to receive payment, directly or indirectly, for the services he provided Prelude.  *Id.*  Indeed, consistent with past practice, all payments received from Prelude were to be sent to, and in fact belonged to, True. *Id.*

52.    Coker executed the Coker Addendum on January 17, 2024, followed by Riggione on January 19, 2024.  *Id.*

53.    On January 30, 2024, ***just thirteen days after executing the Coker Addendum***, HTX, Coker and Hunt's new formed LLC, entered into a Consulting Agreement with Prelude, effective February 19, 2024 ("Prelude Agreement).  *See* Prelude Agreement, attached hereto as **Exhibit F**.

54.    As a part of Coker's and Hunt's secret efforts to compete with True ***while still employed***, the Prelude Agreement required Prelude to pay ***HTX***, not True, a $90,000 consulting fee, made payable in equal $15,000 installments per month for six months.  *Id.*

55.    Neither Stadler nor Riggione were ever made aware of the terms of the Prelude Agreement, including the terms and conditions of the professional fees and expenses to be paid by Prelude, nor would they have agreed to allow Prelude to pay HTX directly if they had known of Coker's hidden agenda. In short, Coker and Hunt concealed the Prelude Agreement and its payment-to-HTX terms from True, because they knew such payments should go to True and would not be acceptable to True if True was made aware of them.

E.    **Coker Fraudulently Induces True to Rescind His Restrictive Covenants, Accepts the Climate Tech Practice Group Lead Position.**

56.    Meanwhile, as Coker progressed toward becoming True's Climate Tech practice group leader, Coker repeatedly assured True he was dedicated to the success of the practice in the present and for years to come.

57.    Coker leveraged these false promises to lead the Climate Tech practice group to put pressure on Stadler and Riggione to agree to rescind Coker's restrictive covenants in the Coker Agreement.

58.    Eventually, after over one year of exposing Coker to key relationships, training, and business opportunities, on November 25, 2024, True offered Coker a position as the Climate Tech practice lead.  *See* November 25, 2024 Offer Letter attached hereto as **Exhibit G**.

59.    Given Coker's representations and repeated promises that he intended to loyally and dutifully perform his role as the Climate Tech practice lead for True and True's lack of awareness of Coker's improper dealings with Prelude Ventures, True agreed to terminate Coker's restrictive covenants included in the Coker Agreement.  *Id.*

60.    Coker signed the November 25, 2024 offer letter on December 6, 2024.

61.    However, unbeknownst to Stadler and Riggione, Coker never intended to fulfil his promises to become the Climate Tech practice lead. He falsely stated a willingness to assume that role in order to induce Stadler to remove Coker's competitive restrictions.

62.    Coker's falsehoods, on which True relied, induced True to modify the Coker Agreement that, but for Coker's false representations, True would not have agreed to otherwise.

**F.**    **Individual Defendants Begin Misappropriating True's Confidential Information and Trade Secrets to Use at HTX While Still Employed by True.**

63.    Behind the scenes, Coker and Hunt began soliciting other employees, including Reilly and Judson Hawk, to join them at HTX having gained a wealth of knowledge regarding True's Confidential Information.

64.    As early as September 2024, ***while still employed by and collecting paychecks from True***, the Individual Defendants began secretly sending True Confidential Information, as defined herein, to their personal emails, examples of which are included below:

   a. On September 24, 2024, Hunt emailed Coker a confidential fee agreement with a third-party from his True email account and copied his personal email account, wphuntx3@gmail.com

   b. On November 6, 2024, Hunt sent an email containing a True client's confidential PowerPoint related to confidential information the client and True use to attract potential high-level candidates, from his True email account to his personal email account, wphuntx3@gmail.com

   c. On November 7, 2024, Hunt sent the curricula vitae of various prospective True candidates to be placed at True clients from his True email account to his personal email account, wphuntx3@gmail.com.

   d. In one email, a prospective candidate stated to Hunt, "I am pumped for you to start 2025 as the head of your [own] firm!!! Let me know how I can support you" in reference to the Individual Defendant's secret plan to form HTX.

65.     Simultaneously, and again while still employed and collecting a paycheck from True, Coker began redirecting prospective clients to HTX.  For example:

    a.  On December 3, 2024, a True client ("Company 1") emailed Coker's True email address regarding a new CEO search the client was launching for a portfolio company.

    b.  Shortly thereafter, Coker began identifying potential candidates for Company 1, and the client began conducting interviews of those candidates.

    c.  On January 10, 2025, the same day the Individual Defendants resigned, Company 1 emailed a prospective candidate's curriculum vitae to Coker's True email address.

    d.  To True's surprise, on January 27, 2025, days after the Individual Defendants resigned, Company 1 emailed Coker's True email account, along with Hunt's HTX email account, expressing excitement to start working with HTX and asked questions regarding the use of HTX's database/shared drive for candidate profiles and feedback.  Company 1 also asked questions regarding an executive search HTX was to perform.

    e.  On February 3, 2025, Coker emailed Company 1, copying Hunt, Hawk, and Reilly requesting that True's client send an overview deck of the client's investors to allow HTX to provide context to prospective candidates for Company 1's needs.

    f.  On the same day, Company 1 responded to Coker's email regarding the overview deck, but sent the email response to Coker's True email address.

g.  In short, Coker and Hunt learned of an opportunity for a new search with an existing True client to which they had been introduced at True, and instead diverted the opportunity to their competing venture, HTX.

66.  Upon information and belief, HTX, including the Individual Defendants, currently performs paid services for Company 1 while misappropriating True's trade secrets.

## G.  **Individual Defendants Simultaneously Resign from True on January 10, 2025.**

67.  On January 10, 2025, as the Individual Defendants were preparing to announce their resignation from True, Coker accessed over 300 True documents containing True's confidential information.

68.  That same day, in a coordinated effort, Coker, Hunt, Reilly, and Hawk all resigned from True.[1]

69.  The Individual Defendant's resignation left Stadler, Riggione, and other True employees stunned and feeling betrayed, particularly with respect to what they learned were Coker's lies and false promises leading up to Coker's resignation.

70.  Indeed, after Coker resigned, he informed a True employee that Coker felt he had to mislead Stadler and Riggione into believing that Coker fully intended to execute dutifully his responsibilities as the Climate Tech practice group leader, to convince them to terminate the restrictive covenants in the Coker Agreement.

---

[1]    As a final deliberately misleading effort to represent he "intended" to take the Climate Tech practice group lead position at True, on January 10, 2025, the day Coker resigned, Coker changed his job title on his LinkedIn profile to indicate that he was the Climate Tech practice group lead at True.  However, Coker never formally assumed that role.

71.     In the months leading up to their resignation, the Individual Defendants accrued and failed to collect over ***one million dollars*** in accounts receivable while working at True, that True will now be challenged to collect following the Individual Defendant's departure.

72.     Upon information and belief, the Individual Defendants intentionally failed to collect these outstanding payments in an effort to later collect those payments from the clients at HTX, whether directly, or indirectly through engagement of HTX on new searches.

73.     Both before and after their resignation, the Individual Defendants and HTX misappropriated, and continue to misappropriate, True's Confidential Information to retain True's clients, and did retain at least one True client, Company 1, services to their benefit and to True's detriment.

74.     Because Defendants have already, as described herein, misappropriated True's Confidential Information to unlawfully poach True clients, upon information and belief, Defendants have, and are continuing to, misappropriate True's Confidential Information to unlawfully poach additional True clients.

75.     Moreover, upon information and belief, Defendants have, and continue to, solicit True employees in violation of the Coker and Reilly Agreements, and use the True Confidential Information they acquired while employed by True to their economic benefit and True's economic detriment.

76.     Accordingly, because of Defendants' unlawful actions, as detailed herein, True sets forth the following claims:

## COUNT I
## BREACH OF DUTY OF LOYALTY

### (<u>Coker, Hunt, and Reilly</u>)

77.     All the preceding and following paragraphs are incorporated as if set forth at length.

78.     The Individual Defendants were employed by True and owed a duty of loyalty to True both by agreement and by operation of law.

79.     Within their respective roles at True, True entrusted the Individual Defendants with, and they acquired, substantial knowledge of True's trade secrets and confidential and proprietary information, including the development of such information.   True entrusted the Individual Defendants to safeguard this information and to act solely for the benefit of True during their employment.

80.     Individual Defendants breached their duties of loyalty to True, including but not limited to their duties of care, loyalty, and good faith, by engaging in the acts described herein.

81.     As a direct and proximate result of the Individual Defendant's breach of their duties of loyalty to True, True has suffered and, if their conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial, and are entitled to pre- and post-judgment interest, attorneys' fees, and other costs allowed by law.

## COUNT II
## <u>BREACH OF CONTRACT</u>

### (Coker)

82.     All the preceding and following paragraphs are incorporated as if set forth at length.

83.     Because Coker fraudulently induced True into agreeing to rescind the restrictive covenants in the Coker Agreement, Coker's November 25, 2025 Offer Letter is unenforceable, void, and Coker remains bound by the restrictive covenants in the Coker Agreement.

84.     The restrictive covenants in the Coker Agreement are valid and enforceable contracts and based on sufficient consideration under New Jersey law. Further, the non-solicitation of employees and True clients and confidentiality provisions are all enforceable agreements.  The

18

restrictions contained in the agreements are reasonably necessary to protect the legitimate business interests identified in this Complaint, and those agreements.

85.     The non-solicit covenants in the Coker Agreement, tied to certain customers with whom Coker had contact or True employees, is reasonable, even without a geographic restraint, because the customer-based restraints are also sufficiently narrow to protect True's legitimate interests.

86.     True has satisfied all its contractual obligations to Coker, if any.  Further, Coker has received valuable consideration in support of all the restrictive covenants, including his continuous access to True's confidential and trade secret information following the HTI acquisition in support of his restrictions in the Coker Agreement, and the compensation provided to him by True as further consideration for his restrictions in the Coker Agreement.

87.     By retaining and using True's confidential and proprietary information, Coker has knowingly, intentionally, and materially breached the terms of the non-disclosure clauses in the Coker Agreement.

88.     True has been and continues to be damaged by Coker's improper and unlawful actions in breaching the Coker Agreement.

89.     As a direct and proximate result of Coker's breach, True has suffered damages for conduct not addressed by any injunctive relief this Court may grant, irreparable harm for which there is no adequate remedy at law, and other damage ancillary to the Coker's breaches.

90.     Accordingly, for future conduct that is redressable via injunctive relief, True is entitled to an injunction restraining Coker, and all others acting in concert with him, including but not limited to Hunt, Reilly, and HTX, from engaging in activities that violate the contractual obligations undertaken by Coker in the Coker Agreement.

91.     True is also entitled to an award of damages, which does not overlap with its request for injunctive relief, incurred because of Coker's material breaches of his contractual obligations under the Coker Agreement, in an amount to be determined at trial.

## COUNT III
## BREAD OF CONTRACT

### (Hunt)

92.     All the preceding and following paragraphs are incorporated as if set forth at length.

93.     The restrictive covenants in the Hunt Offer Letter are valid and enforceable contracts and based on sufficient consideration under New Jersey law.

94.     True has satisfied all its contractual obligations to Hunt, if any.  Further, Hunt has received valuable consideration in support of his promise to maintain the confidentiality of True's confidential and trade secret information in support of his restrictions in the Hunt Offer Letter, and the compensation provided to him by True as further consideration for his restrictions in the Hunt Offer Letter.

95.     By retaining and using True's confidential and proprietary information, Hunt has knowingly, intentionally, and materially breached the terms of the non-disclosure clauses in the Hunt Offer Letter.

96.     Additionally, by not working for True for three full years, Hunt's Bonus is subject to the claw back provisions of the Hunt Offer Letter.  *See* **Exh. B**.  In total, Hunt owes True $77,230.27.

97.     True has been and continues to be damaged by Hunt's improper and unlawful actions in breaching the Hunt Offer Letter.

98.    As a direct and proximate result of Hunt's breach, True has suffered damages for conduct not addressed by any injunctive relief this Court may grant, irreparable harm for which there is no adequate remedy at law, and other damage ancillary to the Hunt's breaches.

99.    Accordingly, for future conduct that is redressable via injunctive relief, True is entitled to an injunction restraining Hunt, and all others acting in concert with him, including but not limited to Coker, Reilly, and HTX, from engaging in activities that violate the contractual obligations undertaken by Hunt in the Hunt Offer Letter.

100.    True is also entitled to an award of damages, which does not overlap with its request for injunctive relief, incurred because of Hunt's material breaches of his contractual obligations under the Hunt Offer Letter, in an amount to be determined at trial.

## COUNT IV
## BREACH OF CONTRACT

### (Reilly)

101.    All the preceding and following paragraphs are incorporated as if set forth at length.

102.    The restrictive covenants in the Reilly Agreement are valid and enforceable contracts and based on sufficient consideration under New Jersey law.  Further, the non-solicitation of employees and True clients and confidentiality provisions are all enforceable agreements.  The restrictions contained in the agreements are reasonably necessary to protect the legitimate business interests identified in this Complaint, and those agreements.

103.    The non-solicit covenants in the Reilly Agreement, tied to certain customers with whom Reilly had contact or True employees, is reasonable, even without a geographic restraint, because the customer-based restraints are also sufficiently narrow to protect True's legitimate interests.

104. True has satisfied all its contractual obligations to Reilly, if any. Further, Reilly has received valuable consideration in support of all the restrictive covenants, including his continuous access to True's confidential and trade secret information in support of his restrictions in the Reilly Agreement, and the compensation provided to him by True as further consideration for his restrictions in the Reilly Agreement.

105. By retaining and using True's confidential and proprietary information, Reilly has knowingly, intentionally, and materially breached the terms of the non-disclosure clauses in the Reilly Agreement.

106. True has been and continues to be damaged by Reilly's improper and unlawful actions in breaching the Reilly Agreement.

107. As a direct and proximate result of Reilly's breach, True has suffered damages for conduct not addressed by any injunctive relief this Court may grant, irreparable harm for which there is no adequate remedy at law, and other damage ancillary to the Reilly's breaches.

108. Accordingly, for future conduct that is redressable via injunctive relief, True is entitled to an injunction restraining Reilly, and all others acting in concert with him, including but not limited to Hunt, Coker, and HTX, from engaging in activities that violate the contractual obligations undertaken by Reilly in the Reilly Agreement.

109. True is also entitled to an award of damages, which does not overlap with its request for injunctive relief, incurred because of Reilly's material breaches of his contractual obligations under the Reilly Agreement, in an amount to be determined at trial.

## COUNT IV
## <u>TORTIOUS INTERFERENCE WITH CONTRACT, BUSINESS RELATIONSHIPS AND EXPECTANCIES</u>

### (All Defendants)

110.    All the preceding and following paragraphs are incorporated as if set forth at length.

111.    True's restrictive covenants and confidentiality covenants are valid and enforceable contracts.  The restrictive covenants are reasonable in scope and duration and are reasonably necessary to protect legitimate, protectable interests in the goodwill, long-term customer relationships, and proprietary business and customer information of True, as described more fully above.

112.    Defendants knew, or should have known, of the restrictive covenants in Coker's and Reilly's Agreements with True, including before soliciting Reilly's employment with True and soliciting True's clients (including while still employed by True).

113.    Defendants intentionally and unjustifiably induced or permitted Coker's and Reilly's breach of the agreements and is wrongfully profiting from client accounts obtained in violation of Coker's and Reilly's obligations under their respective agreements.

114.    As a direct and proximate result of Defendants' tortious conduct, True has been damaged in an amount to be proven at trial and, for future conduct that will cause irreparable harm and for which there is no adequate remedy at law, True seeks injunctive relief to protect its confidential information, goodwill, and other legitimate business interests.

## COUNT V
## <u>CONSPIRACY</u>

### (All Defendants)

115.    All the preceding and following paragraphs are incorporated as if set forth at length.

116.    Defendants were members of a common conspiracy.  The objects of the conspiracy were to accomplish unlawful purposes: the misappropriation, disclosure and misuse of True's confidential and trade secret information and the various breaches of Coker's and Reilly's contractual obligations to True.

117.    Defendants had a meeting of the minds to accomplish the acts described above to further their business to the detriment of True.

118.    As described above, Defendants committed the overt acts of misappropriation of True's trade secrets and various breaches of their respective agreements.

119.    True suffered, and seeks, actual damages because of Defendants' conduct. Defendant conspirators are jointly and severally liable for all acts done by them in furtherance of their unlawful combination.

120.    True seeks exemplary damages against Defendants because Defendants acted with malice in furtherance of the conspiracy, which was designed to cause injury to True.

**COUNT VI**
**TRADE SECRET MISAPPROPRIATION**
**UNDER THE FEDERAL DEFEND TRADE SECRETS ACT**

**(All Defendants)**

121.    All the preceding and following paragraphs are incorporated as if set forth at length.

122.    As set forth above, True has certain proprietary Confidential Information, as defined in the aforementioned Individual Defendant agreements, that is critical to its success and competitive position in the executive search industry. This Confidential Information has been gathered and developed over True's years of operation and provides True with a competitive advantage in the marketplace.

123.    The Confidential Information constitutes trade secrets under the Defend Trade Secrets Act. This information derives independent economic value, actual or potential, is not generally known to, and not readily ascertainable by proper means by, other people who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

124.    True's Confidential Information is not generally known outside True, cannot be easily recreated by its competitors (such as Defendants), and would inure substantial economic benefit to its competitors (such as Defendants) given the time, resources, and personnel that Defendants do not have to invest to recreate the Confidential Information that True developed at substantial cost. Indeed, as the Individual Defendants acknowledged in their respective agreements, True would suffer severe and immeasurable competitive injury should the Confidential Information be disclosed to and/or used by their competitors.

125.    True employs efforts that are reasonable under the circumstances to maintain the secrecy of the Confidential Information, to limit access thereto to the Confidential Information to only employees who need to know the specified information, and to protect the Confidential Information and their trade secrets from disclosure and improper use by, among other things, the use of agreements.  True employs these measures, among others, to ensure that its Confidential Information is safe from unauthorized use, acquisition, and/or disclosure, and to protect it from becoming publicly available.

126.    As set forth herein, Defendants have misappropriated True's trade secrets and confidential information.  Those trade secrets are related to a service that is intended for use in interstate commerce.

127.    As described above, Defendants have knowingly, willfully, and maliciously misappropriated True's trade secrets by, *inter alia*:

      a.    Acquiring the Confidential Information with knowledge or reason to know that the Confidential Information was acquired by improper means;

      b.    Disclosing the Confidential Information beyond True, to HTX, a direct True competitor;

      c.    Using the Confidential Information without True's consent constitutes a misappropriation of those trade secrets because:

          i.    Defendants used improper means to acquire the Confidential Information;

          ii.    Defendants knew or had reason to know that they acquired the Confidential Information from or through a person and/or persons, Defendants, who utilized improper means to acquire the Confidential Information for Defendants' benefit;

          iii.    Defendants knew or had reason to know that they acquired the Confidential Information under circumstances giving rise to a duty Defendants to maintain its secrecy or limit its use (as detailed herein); and

          iv.    Defendants knew or had reason to know that they acquired the Confidential Information through a person and/or persons, the Defendants, who owed a duty to True to maintain the secrecy and/or limit the use of the Confidential Information.

128.    In addition, Defendants have knowingly, willfully, and maliciously misappropriated True's trade secrets by knowingly using such Confidential Information in connection with HTX's continued business operations to their benefit and to True's detriment, as alleged herein.

129.    As a direct and proximate result of Defendants' improper, unlawful, willful, and malicious conduct, True has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial, and are entitled to exemplary damages, pre- and post-judgment interest, attorneys' fees, and other costs as allowed by law.

## COUNT VII
## VIOLATION OF THE
## <u>TEAXAS HARMFUL ACCESS BY COMPUTER ACT</u>

### (Coker, Hunt, and Reilly)

130.    All the preceding and following paragraphs are incorporated as if set forth at length.

131.    Using Plaintiff's computer equipment and systems, Coker, Hunt, and Reilly accessed True's confidential information without authorization.

132.    In doing so, Coker, Hunt, and Reilly retrieved and intercepted data from, altered data or computer software in, or otherwise made use of a resource—i.e., accessed (as defined by Tex. Pen. Code § 33.02(a))—a computer, computer network, computer program, or computer system owned by True.

133.    Although Coker, Hunt, and Reilly had Plaintiff's consent to access its computer, network, and systems during her employment for job-related purposes, they did not have True's consent to using its resources for her own benefit during their employment with HTX.

134.     Accordingly, Coker, Hunt, and Reilly knowingly accessed True's computer, computer network, or computer system without True's consent, pursuant to Tex. Pen. Code § 33.01(12).

135.     As a direct and proximate result of Coker, Hunt, and Reilly misappropriation of True's property, True has suffered and continue to suffer damages, with the exact amount to be proven at trial.

136.     As a direct and proximate result of Coker, Hunt, and Reilly theft of True's property, True is entitled to recover their reasonable attorneys' fees and costs pursuant to Tex. Civ. Prac. & Rem. Code § 143.002(2).

137.     Coker, Hunt, and Reilly acted with specific intent to cause substantial injury to True.  True is therefore entitled to an award of exemplary damages against Coker, Hunt, and Reilly in an amount in excess of this Court's minimum jurisdictional limits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, True Capital Partners, LLC, demands judgment against Defendants, Jack Coker, Wrendon Hunt, Luke Reilly, and HTX-LDN, LLC d/b/a H&C Search and seeks the following relief:

Award Plaintiffs a TRO, preliminary injunction, and permanent injunction that:

(1)     enforces Coker's and Reilly's restrictive covenant agreements with True and prohibits Coker and Reilly from engaging in activities that violate their contractual obligations contained in their respective agreements;

(2)     enjoins Individual Defendants and anyone acting in concert with them, including HTX, from misappropriating, using, or disclosing any of True's confidential information and trade secrets;

    (3)    directs Defendants to immediately return to True any of True's property, documents, confidential information, and trade secrets in their possession, custody, or control;

    (5)    enjoins Defendants from tortiously interfering with True's contracts, business relationships, and expectancies.

B.    Enter judgment against Individual Defendants for breach of contract.

E.    Enter judgment against Defendants for tortious interference;

F.    Enter judgment against Defendants for conspiracy;

G.    Enter judgment against Defendants for violations of the Federal Defense of Trade Secrets Act.

H.    Award True its attorneys' fees and costs;

I.    Award True such damages as may be proven at trial;

J.    Award True exemplary and/or punitive damages for Defendants' willful and malicious conduct; and

K.    Award True such other and further relief as the Court deems just and proper.

Respectfully submitted,

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**

*/s/ Stephen J. Quezada*
Stephen J. Quezada
USDC Bar No.
Texas Bar No.
One Allen Center
500 Dallas Street, Suite 3000
Houston, Texas 77002
713.655.5761
713.655.0020 (Fax)
stephen.quezada@ogletreedeakins.com

29

Docusign Envelope ID: EEB66792-9CBA-4918-99AE-C463E9687E37

## **VERIFICATION**

Under penalties as provided by law pursuant to 28 U.S.C. § 1746, the undersigned, Brad Stadler, Co-Chief Executive Officer, True Capital Partners, LLC ("True"), acting in the capacity of a corporate representative of True hereby verifies that he has read the foregoing Verified Complaint and Application for TRO, Preliminary and Permanent Injunctive Relief and Damages, and declares under penalty of perjury that the factual statements found in Paragraphs 4-76 are based on either his personal knowledge or True's corporate knowledge and are true and accurate.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on ___March 4___, 2025

Signed by:

*Brad Stadler*

3633F2835729402...

Brad Stadler